1
2
3
4
5
6
7          **IN THE UNITED STATES DISTRICT COURT**

8          **FOR THE EASTERN DISTRICT OF CALIFORNIA**

9

10   MICHAEL AARON JAYNE,               )   Case No. 2:08-cv-02767-MSB
                                        )
11            Plaintiff,                )   **ORDER GRANTING IN PART,**
                                        )   **AND DENYING IN PART,**
12   vs.                               )   **DEFENDANTS' MOTIONS FOR**
                                        )   **SUMMARY JUDGMENT (Dkts.**
13   TOM BOSENKO, et al.,              )   **#90,  97), AND GRANTING**
                                        )   **DEFENDANTS' MOTION FOR**
14            Defendants.               )   **AN EXTENSION OF TIME (Dkt.**
     _____)  **#121)**
15

16          In November 2008, Plaintiff Michael Aaron Jayne filed a pro se civil

17   rights complaint pursuant to 42 U.S.C. § 1983 regarding the conditions of his

18   confinement in Shasta County Jail from the fall of 2007 through late 2008.

19   (Dkt. No. 1.)  Although Jayne raised a number of claims, he has proceeded to

20   litigate only: (1) his claim that three Shasta County Jail officers violated his

21   constitutional rights by placing him on a disciplinary diet for ninety-two days,

22   and (2) his claims that Deputy District Attorney Eric Anderson and ten Shasta

23   County Jail officers interfered with his constitutional rights by recording or

24   listening to recordings of his attorney-client phone calls.  (Dkt. No. 114.)  This

25

26

27

28

Order addresses Defendants' motions for summary judgment on these remaining claims.[1]

## I.  Factual and Procedural History

Jayne filed his complaint on November 18, 2008, seeking monetary damages as well as declaratory and injunctive relief.  (Dkt. No. 1 at 1, 3.)  At that time, Jayne was a pretrial detainee at the Shasta County Jail in Redding, California, where the events of which he complains are alleged to have occurred.[2]  (Dkt. No. 1 at 3.)  On November 20, 2009, the Court dismissed several of Jayne's claims under 28 U.S.C. § 1915A, which requires judicial screening of complaints brought by prisoners seeking relief against a governmental entity or an employee of a governmental entity.  (Dkt. No. 19.)

This Court determined, however, that the complaint states a cognizable claim against Defendants Tom Bosenko, Eric Anderson, Donald Van Buskirk, Sheila Ashmun, Carl Champagne, Jose Gonzalez, Steven Heyde, Randy Joiner, Rene Meek, Matthew Mitchell, and Jesse Penland.  (Dkt. No. 19.)  On January 28, 2011, Defendants filed a motion for summary judgment, or in the alternative, summary adjudication of issues, on Jayne's remaining claims against them.  (Dkt. No. 97.)  Mainly, Defendants assert that Jayne cannot

---

[1] Jayne also alleged that Dr. Stan Johnson provided him with deficient medical care, and Johnson subsequently moved for summary judgment.  (Dkt. No. 90.)  Because Jayne has abandoned all of his claims aside from those involving the disciplinary loaf diet and the attorney-client phone calls, (Dkt. No. 114), no claims against Johnson remain.  Johnson's motion for summary judgment is therefore granted.

[2] Although Jayne's transfer from Shasta County Jail moots his claims for injunctive and declaratory relief, he retains a legally cognizable interest in the outcome of this case because of his request for monetary damages.  *See Wiggins v. Rushen*, 760 F.2d 1009, 1011 (9th Cir. 1985); *see also Incumaa v. Ozmint*, 507 F.3d 281, 286-87 (4th Cir. 2007).

1  establish that there is any genuine issue of material fact which, if resolved in his

2  favor, would prove that his civil rights have been violated. (Dkt. No. 97.)

3  Alternatively, Defendants maintain that they are entitled to absolute or qualified

4  immunity for their conduct.  (Dkt. No. 97 at 2.)

5      On April 7, 2011, Jayne filed an opposition to summary judgment in

6  which he abandoned all but two of his claims.  (Dkt. No. 114.)  Specifically,

7  Jayne maintains: (1) that Defendants Bosenko, Van Buskirk, and Ashmun

8  violated his due process rights by placing him on a disciplinary diet for ninety-

9  two days as punishment, and (2) that Deputy District Attorney Eric Anderson

10  and ten Shasta County Jail officers violated his Fourth Amendment rights by

11  recording or listening to recordings of telephone communications between him

12  and his criminal attorney.  (Dkt. No. 114.)  Defendants have since filed a reply

13  in support of summary judgment, reiterating that Jayne has failed to adduce any

14  evidence sufficient to create a triable issue of fact with respect to these two

15  remaining claims.[3]  (Dkt. No. 124.)

16              **II.  Legal Standard**

17      Summary judgment is appropriate "if the movant shows that there is no

18  genuine dispute as to any material fact and the movant is entitled to judgment as

19  a matter of law."  Fed. R. Civ. P. 56(a); *California v. Campbell*, 138 F.3d 772,

20  780 (9th Cir. 1998).  A fact is "material" if proof of its existence or non-

21  existence might affect the outcome of the litigation, and a dispute is "genuine"

22  if "the evidence is such that a reasonable jury could return a verdict for the

23  nonmoving party."  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).

24  The Court may not weigh the evidence, and is required to view the evidence in

25  the light most favorable to the nonmoving party—here, Jayne.  *Id*. at 249; *Lopez*

26  *v. Smith,* 203 F.3d 1122, 1131 (9th Cir. 2000) (en banc).

27  _____

28      [3] Defendants' motion for an extension of time to file their reply in
support of their motion for summary judgment is GRANTED.  (Dkt. No. 121.)

1    The moving party has the burden of establishing the absence of a genuine

2    issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  If

3    the moving party does not bear the burden of proof on an issue at trial, it may

4    discharge its burden of production in one of two ways:

5          The moving party may produce evidence negating an essential
           element of the nonmoving party's case, or, after suitable discovery,
6          the moving party may show that the nonmoving party does not
           have enough evidence of an essential element of its claim or
7          defense to carry its ultimate burden of persuasion at trial.

8    *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1106 (9th Cir.

9    2000).  If the moving party discharges his burden through the first method, it

10   must produce affirmative evidence negating the non-moving party's claim or

11   defense.  *Id.* at 1105-06.  It is not required to support its motion with such

12   evidence if it discharges its burden through the second method.  *Id.*

13       If the moving party satisfies his initial burden by either method, the

14   burden then shifts to the opposing party to establish that a genuine dispute

15   exists.  *Id.* at 1106-07.  To do so, "the opposing party may not rely on denials in

16   the pleadings but must produce specific evidence, through affidavits or

17   admissible discovery material, to show that the dispute exists."  *Bhan v. NME*

18   *Hosps., Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991).

19                        **III.  Disciplinary Loaf**

20   **A.    Background**

21       Jayne alleged in his complaint that, under Lieutenant Ashmun's orders,

22   and under a policy supported by Sheriff Bosenko and Captain Van Buskirk, he

23   was served a disciplinary diet consisting of two servings per day of

24   "disciplinary loaf" for 92 out of 120 days, and as a result he was harmed in

25   violation of his constitutional rights.  (Dkt. No. 1 at 4; Dkt. No. 114 at 2.)  A

26   disciplinary loaf is a meatloaf prepared by a jail's chef in accordance to a recipe

27   dictated by the California regulatory code, Cal. Code Regs. tit. 15, § 1247(b).

28

(Dkt. No. 97-5 at 2.)  Those regulations also set forth how the loaf must be served:

> Such a diet shall be served twice in each 24 hour period and shall consist of one-half of the loaf . . . along with two slices of whole wheat bread and at least one quart of drinking water if the cell does not have a water supply.  The use of disciplinary isolation diet shall constitute an exception to the three-meal-a-day standard.

Cal. Code Regs. tit. 15, § 1247(a).

Defendants argue that imposition of the disciplinary diet did not violate the Constitution.  According to Ashmun and Van Buskirk, the disciplinary loaf recipe "is guaranteed to meet or exceed the minimum daily nutritional and caloric requirements of adults" and is followed by the chef at Shasta County Jail.  (Dkt. No. 97-5 at 2; Dkt. No. 97-15 at 2.)  But Defendants have not adduced any evidence showing that the *particular* loaves that Jayne was fed comported with the recipe.  *See Prude v. Clarke*, 675 F.3d 732, 734 (7th Cir. 2012) ("[N]utriloaf [i.e., a disciplinary loaf] could meet requirements for calories and protein one day yet be poisonous the next if, for example, made from leftovers that had spoiled. . . . Even an affidavit from an expert stating after a detailed chemical analysis that 'nutriloaf meets all dietary requirements' would be worthless unless the expert knew and stated that nutriloaf invariably was made the same way in the institution.").

Jayne states in his affidavit that he was served neither milk nor other fluids as part of the disciplinary diet, and that when he was served the loaf, it was "[c]ommonly . . . not cooked all the way or cooked too much."  (Dkt. No. 115-2 at 95.)  He attests that he lost weight and became ill as a result of being on the loaf diet.  (Dkt. No. 115-2 at 95.)

**B.   Discussion**

    **1.   Ashmun**

Ashmun prescribed the sequence of days within the 120-day period during which Jayne would be fed the disciplinary loaf; the periods ranged from

- 5 -

two to ten days at a time, for a total of 92 days.  (Dkt. No. 97-6 at 1; Dkt. No. 115-2 at 18.)  Jayne avers in his complaint that the disciplinary diet was the result of "rule violations," (Dkt. No. 1 at 4), but neither party has indicated what those violations were or why Ashmun decided to serve Jayne the diet for so many days.

Jayne was a pretrial detainee during the events at issue here, so his claim is governed by the Fourteenth Amendment's Due Process Clause and not by the Eighth Amendment's protections against cruel and unusual punishment.  *See Bell v. Wolfish*, 441 U.S. 520, 535 & n.16 (1979); *Or. Advocacy Ctr. v. Mink*, 322 F.3d 1101, 1120 (2003).  The Due Process Clause prohibits punishment of detainees like Jayne for the crimes that led to their detention but for which no adjudication of guilt has yet been made.  *Bell*, 441 U.S. at 535; *see also Demery v. Arpaio*, 378 F.3d 1020, 1029 (9th Cir. 2004); *Mitchell v. Dupnik*, 75 F.3d 517, 524 (9th Cir. 1996).  Prison officials may, however, discipline detainees for violations of a facility's rules; pretrial detainees are not "free to violate jail rules with impunity." *Mitchell*, 75 F.3d at 524.

Thus, while the relevant regulations describe the loaf diet as a "punitive action," Cal. Code of Reg. tit. 15, § 1082, this designation does not itself indicate that the diet qualifies as unconstitutional "punishment" within the meaning of *Bell*.  Jayne concedes that the sanction was ostensibly imposed in response to his violations of the jail's rules (Dkt. No. 1 at 4), rather than in response to the crime for which he was charged.  In other words, he admits that there was no "expressed intent to punish on the part of detention facility officials," *Bell*, 441 U.S. at 538, but argues that Ashmun imposed the diet with an implied "intent to punish" that violated his Fourteenth Amendment rights.  (Dkt. No. 114 at 58.)  The Court's inquiry thus shifts to "whether an alternative purpose to which [the restriction] may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose

1    assigned [to it.]"  *Bell*, 441 U.S. at 538 (alterations in original) (quoting

2    *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168-69 (1963)).

3         Accordingly, the relevant question here is whether Jayne's disciplinary

4    loaf diet crossed the line separating permissible discipline during pretrial

5    detention from unconstitutional "punishment" in violation of the Fourteenth

6    Amendment.  The Ninth Circuit has held that a disciplinary measure crosses

7    this line when (1) it causes the pretrial detainee to suffer "some harm or

8    disability" and (2) "the purpose of the governmental action [is] to punish the

9    detainee."  *Demery*, 378 F.3d at 1029 (citing *Bell*, 441 U.S. at 538).  If the

10   action "is not reasonably related to a legitimate goal—if it is arbitrary or

11   purposeless—a court permissibly may infer that the purpose of the

12   governmental action is punishment" and so is unconstitutional.  *Bell*, 441 U.S.

13   at 539.  Although "[r]etribution and deterrence are not legitimate nonpunitive

14   governmental objectives," *Bell*, 441 U.S. at 539 n.20, "maintain[ing] security

15   and order" at the facility is, *id.* at 540.

16        As to the first prong of the *Demery* test, there is no requirement that, "to

17   be punishment, a harm must be independently cognizable as a separate

18   constitutional violation . . . . Rather, to constitute punishment, the harm or

19   disability caused by the government's action must either significantly exceed,

20   *or* be independent of, the inherent discomforts of confinement."  *Demery*, 378

21   F.3d at 1030 (emphasis added).  Defendants do not contest that Jayne was

22   prescribed the disciplinary diet as a result of rule violations." (Dkt. No. 1 at 4.)

23   That jail officials imposed the loaf diet as a "punitive action," Cal. Code of Reg.

24   tit. 15, § 1082, indicates that the diet is "independent of . . . the inherent

25   discomforts of confinement," *Demery*, 378 F.3d at 1030, and thus constitutes a

26   harm or disability within the meaning of the Fourteenth Amendment.

27        Jayne has, moreover, demonstrated that the disciplinary diet

28   "significantly exceed[s] . . . the inherent discomforts of confinement," *Demery*,

- 7 -

378 F.3d at 1030.  He states in his declaration that he lost weight and fell ill as a result of being served the loaf "for 92 days out of 120 days with the majority of those days being served 10 days straight back to back."  (Dkt. No. 115-2 at 95.) Although there are no Fourteenth Amendment cases directly addressing when a disciplinary loaf diet significantly surpasses the "inherent discomforts of confinement," *id.*, the Eighth Amendment case law is instructive here, because it sets a floor below which treatment of pretrial detainees like Jayne may not dip.  *See Or. Advocacy Ctr.*, 322 F.3d at 1120.  Because "the due process rights of pretrial detainees are 'at least as great as the Eighth Amendment protections available to a convicted prisoner,'" *id.* (quoting *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983)); *see Frost v. Agnos*, 152 F.3d 1124, 1128 (9th Cir. 1998), actions that constitute actionable harm under the Eighth Amendment necessarily go beyond the discomforts inherent in confinement.

The Eighth Amendment cases establish that prisoners may demonstrate actionable harm from food-related restrictions by showing that those restrictions interfered with their ability to maintain health.  While moderate weight loss *alone* may not be sufficient to constitute harm, weight loss leading to or accompanied by other maladies may suffice.

In *Foster v. Runnels*, 554 F.3d 807, 813 n.2 (9th Cir. 2009), for example, the Ninth Circuit held that an inmate's allegations of weight loss, headaches, and dizziness due to inadequate nutrition during the period in which he was denied meals stated a cognizable claim under the Eighth Amendment.  In contrast, in *McEachin v. McGuinnis*, 357 F.3d 197, 199, 201 (2d Cir. 2004), the Second Circuit affirmed a grant of summary judgment against a prisoner who claimed that a week-long loaf diet violated the Eighth Amendment.  In so holding, the court explained that the prisoner had failed to allege that the diet was nutritionally inadequate, or posed a health risk, or that he suffered any physical harm from it.  *Id.* at 199.

1    Here, Jayne stated in his declaration that he *both* lost weight *and* became

2    ill, so he has demonstrated harm that would be cognizable under the Eighth

3    Amendment, regardless of whether his weight loss, in itself, can constitute such

4    a harm.  *See, e.g.*, *Prude*, 675 F.3d at 733-34 (holding that evidence of inmate's

5    weight loss, stomach pains, and vomiting due to a loaf-diet were sufficient to

6    defeat summary judgment on an Eighth Amendment claim).  Jayne's

7    declaration that the diet made him sick supports a reasonable inference that the

8    loaves fed to him were, at least sometimes, unhealthy or even inedible.  *See id.*

9    at 734 (observing that evidence that prisoners vomited after eating the nutriloaf

10   "suggests that it was indeed inedible").  As discussed, any harm that would be

11   cognizable under the Eighth Amendment "significantly exceed[s] . . . the

12   inherent discomforts of confinement," *Demery*, 378 F.3d at 1030, within the

13   context of pretrial detention.

14        In short, Jayne has shown adequately that the loaf diet was "independent

15   of[] the inherent discomforts of confinement," *id.*, insofar as Ashmun put him

16   on it as a result of his rule violations.  This showing alone is sufficient to

17   demonstrate a cognizable harm of disability under the Fourteenth Amendment.

18   In addition, Jayne *also* has provided evidence that the disciplinary diet

19   "significantly exceed[s] . . . the inherent discomforts of confinement," *id*.

20   While meals that taste unpleasant but are sufficiently nutritious do not meet this

21   standard, Jayne's declaration that he lost weight and fell ill as a result of the diet

22   creates a reasonable inference that the diet was not, in fact, adequate to sustain

23   health.  His statement conflicts with Ashmun's declaration that the loaf was

24   nutritionally adequate (Dkt. No. 97-5 at 2), and thus raises a triable issue as to

25   whether Ashmun subjected him to a harm significantly exceeding the routine

26   discomforts of jail life.

27        Moving to the second prong of the *Demery* test, the Court now addresses

28   whether there is a genuine issue of material fact as to whether imposition of the

1   loaf diet was "reasonably related to a legitimate goal," *Bell*, 441 U.S. at 539.

2   Jayne admitted in his complaint that Ashmun put him on the disciplinary diet

3   for "rule violations." (Dkt. No. 1 at 4.)  But neither party has provided evidence

4   regarding the nature of these violations.  Although the absence of such evidence

5   makes it difficult to assess whether the disciplinary diet reasonably furthered a

6   permissible goal, the particular circumstances here give rise to a triable issue of

7   fact.

8          Specifically, the record shows that Jayne was subjected to the loaf diet

9   for an exceptionally lengthy period of time: 92 out of 120 days.  (Dkt. No. 1 at

10  4; Dkt No. 114 at 2; Dkt No. 115-2 at 95.)  Although withholding nutritionally

11  adequate food is not a per se constitutional violation, the "amount and duration

12  of the deprivation" is relevant to determining whether there has been a

13  violation.  *Reed v. McBride*, 178 F.3d 849, 853 (7th Cir. 1999).  Notably, this

14  Court has been unable to locate *any* case in which officials prescribed a

15  disciplinary diet for such a lengthy period of time.  While courts have

16  determined that disciplinary diets comported with constitutional requirements in

17  a number of cases, the diets in those cases were imposed for significantly

18  shorter periods of time.  *See, e.g.*, *LeMaire v. Maass*, 12 F.3d 1444, 1456 (9th

19  Cir. 1993) (holding that feeding inmate nutri-loaf for no more than seven days

20  did not constitute an Eighth Amendment violation); *Wingo v. Jenkins*, No. 3:10-

21  cv-00167, 2010 WL 4395446, at *3 (D. Nev. Oct. 29, 2010) (seven days);

22  *Daniels v. Neven*, No. 2:09-cv-01906, 2010 WL 3385366, at *3 (D. Nev. Aug.

23  23, 2010) (four days); *Gordon v. Barnett*, No. C03-5524KLS, 2010 WL

24  597474, at *5 (W.D. Wash. Feb. 16, 2010) (two weeks); *Allinger v. McDaniel*,

25  No. 03:06CV00139LRHVPC, 2007 WL 2875114, at *6 (D. Nev. Sept. 26,

26  2007) (three days); *Arnett v. Snyder*, 769 N.E.2d 943, 950 (Ill. App. Ct. 2001)

27  (six days maximum); *Adams v. Kincheloe*, 743 F. Supp. 1385, 1391-92 (E.D.

28  Wash. 1990) (five days); *United States v. Michigan*, 680 F. Supp. 270, 273

1  (W.D. Mich. 1988) (fourteen days); *Borden v. Hofmann*, 974 A.2d 1249, 1251

2  (Vt. 2009) (seven days maximum).

3      In contrast, courts have reversed determinations that officials acted

4  constitutionally where those officials deprived inmates of adequate and

5  healthful food for lengthier periods of time, particularly where there was

6  evidence that the diet caused negative physical effects on the inmate.  In *Prude*,

7  for example, the Seventh Circuit reversed summary judgment for the defendant

8  prison officials who had forced the plaintiff to subsist on a nutriloaf diet for a

9  total of seventeen days, over two separate time periods.  675 F.3d at 733.  Like

10  Jayne, the plaintiff in *Prude* provided evidence that he both lost weight and fell

11  ill as a result of being subjected to the loaf diet.  *Id*. at 733-34.  Similarly, the

12  Second Circuit held that a prisoner stated an Eighth Amendment claim where he

13  alleged that prison officials deprived him of a nutritionally adequate diet by

14  providing him with meals consisting "solely of raw cabbage and a bread-like

15  loaf that appeared to contain ground vegetables" for fourteen straight days.

16  *Phelps v. Kapnolas*, 308 F.3d 180, 182, 185-87 (2d Cir. 2002).  The prisoner in

17  *Phelps* alleged that he both lost weight and experienced severe abdominal pain

18  as a result of the diet.  *Id*. at 182.  And in *Cunningham v. Jones*, 567 F.2d 653,

19  654 (6th Cir. 1977), the Sixth Circuit reversed dismissal of a prisoner's

20  complaint alleging that the defendant officials had caused him "to be deprived

21  of food for four (4) full days, and thereafter allowed him one (1) full meal every

22  third day for approximately sixteen (16) days, which meal consisted of watery

23  soup or boiled potatoes."  *See also Hutto v. Finney*, 437 U.S. 678, 686-87

24  (1978) (observing that a diet of "grue," a substance created by mashing meat,

25  potatoes, oleo, syrup, vegetables, eggs, and seasoning into a paste and baking

26  the mixture in a pan, "might be tolerable for a few days and intolerably cruel for

27  weeks or months"); *Sanville v. McCaughtry*, 266 F.3d 724, 730, 734 (7th Cir.

28  2001) (suggesting that a prisoner who was restricted to an allegedly inedible

1   "nutri-loaf" diet during the final month of his life may have stated an Eighth

2   Amendment claim); *Hazen v. Pasley*, 768 F.2d 226, 228 n.2 (8th Cir. 1985)

3   (noting that the district court concluded that the defendants had violated the

4   plaintiffs' constitutional rights by providing them with a diet that resulted in

5   "notable weight loss and mildly diminished health" over approximately four

6   months, even though "the difference between the number of calories provided

7   and the number of calories which ideally should have been provided may [have

8   been] small");[4] *Dearman v. Woodson*, 429 F.2d 1288, 1290 (10th Cir. 1970)

9   (holding that a prisoner who alleged that prison officials refused to provide him

10  food for 50.5 hours stated a cause of action under the Eighth Amendment).

11          Viewing the facts in the light most favorable to Jayne, as required by the

12  summary judgment posture, the unusually long duration for which Jayne was

13  administered the disciplinary loaf diet, combined with his resulting illness,

14  creates a triable issue regarding whether the measure was "reasonably related"

15  to a legitimate nonpunitive interest.  On the current record, a reasonable fact

16  finder could conclude that Jayne fell sick due to extended application of the

17  disciplinary diet, and that such a prolonged sanction was excessive in relation to

18  whatever infractions he committed.  In other words, even though jail officials

19  undoubtedly have a serious need to maintain order by sanctioning rules

20  violations, there are both legitimate and illegitimate ways to do so.  Construing

21  the facts most favorably to Jayne, a reasonable juror could determine that forced

22  subsistence on a loaf diet for three out of four months rendered Jayne unable to

23  maintain health and a safe level of physical well-being, thereby constituting an

24  impermissible means through which to accomplish the otherwise legitimate

25  goal of maintaining prison discipline.

26  _____

27          [4] Unlike in this case, the meager diet in *Hazen* was a general condition of
    confinement and was not imposed as a disciplinary measure.  *See* 768 F.2d at
28  227-28.

1    Accordingly, Ashmun's motion for summary judgment is denied.

2    **2.    Bosenko and Van Buskirk**

3    Jayne accuses Bosenko and Van Buskirk of maintaining a policy under

4    which jail officials "made [Jayne] eat 92 days of a cruel and unusual

5    disciplinary diet."  (Dkt. No. 114 at 6.)  Superiors can be liable for an

6    unconstitutional policy "officially adopted and promulgated."  *City of St. Louis*

7    *v. Praprotnik*, 485 U.S. 112, 121 (1988) (internal quotation marks omitted).  A

8    disciplinary loaf diet does not constitute a per se violation of the Fourteenth

9    Amendment, *see LeMaire*, 12 F.3d at 1462; *Frost*, 152 F.3d at 1128, so a policy

10   allowing use of the loaf as a disciplinary measure is not an unconstitutional

11   policy unless it dictates that the diet be prescribed in ways that are excessive or

12   not legitimately related to disciplinary violations.  *See, e.g.*, *Prude*, 675 F.3d at

13   733 (reversing summary judgment for prison officials where the plaintiff inmate

14   produced evidence of weight loss and other infirmities arising from being on a

15   loaf diet for seventeen days "pursuant to a new policy the jail had adopted of

16   making nutriloaf the exclusive diet of prisoners who had been in segregation in

17   prison at the time of their transfer to the jail, even if their behavior in the jail

18   was exemplary").  Other than referring to Ashmun's orders (Dkt. No. 114 at 56;

19   Dkt. No. 115-2 at 95), Jayne provides no evidence demonstrating that Bosenko

20   and Van Buskirk adopted or maintained an unconstitutional policy regarding

21   the use of the loaf on pretrial detainees.  Ashmun's orders, alone, are

22   insufficient to demonstrate that the *policy* was unconstitutional.  A

23   subordinate's unconstitutional application of a constitutional policy does not

24   give rise to § 1983 claim against those who devised the constitutional policy.

25   *See City of Canton v. Harris*, 489 U.S. 378, 387 (1989).

26   Even if superiors are not responsible for an unconstitutional policy, they

27   can still be liable under § 1983 if they were directly involved in the

28   unconstitutional implementation of a policy.  However, Jayne neither provides

evidence nor alleges that either Bosenko or Van Buskirk were directly involved in the order he challenges.  Bosenko acknowledged he was aware that Ashmun ordered Jayne to be served the disciplinary diet, but declares he "had no personal involvement in that [o]rder." (Dkt. No. 97-6 at 1-2.)  Nor does the record suggest that Van Buskirk was directly involved in ordering Jayne to be put on the disciplinary diet.  (Dkt. No. 97-15 at 2.)  Because they were not directly involved in the decision and because respondeat superior liability is unavailable under § 1983, *see Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691 (1978), Bosenko's and Van Buskirk's motions for summary judgment are granted.

### IV.  Recording of Phone Calls

Jayne alleges that each Defendant was responsible for intentionally recording or listening to phone calls between him and his criminal defense attorney in violation of his Fourth, Fifth, Sixth and Fourteenth Amendment rights and in violation of the Federal Wiretap Act.  (Dkt. No. 114 at 2.)  All Defendants move for summary judgment on these claims.

As an initial matter, the Court understands Jayne's claims under the Fifth and Fourteenth Amendments to be premised on substantive due process and to assert a right to confidentiality in conversations with his attorney under that rubric.  (Dkt. No. 114 at 41.)  "Where a claim can be analyzed under 'an explicit textual source' of rights in the Constitution, a court may not also assess the claim under another, 'more generalized,' source." *Ramirez v. Butte-Silver Bow Cnty.*, 298 F.3d 1022, 1029 (9th Cir. 2002) (quoting *Graham v. Connor*, 490 U.S. 386, 394-95 (1989)).  Because the Fourth Amendment's prohibition on unreasonable searches and seizures and the Sixth Amendment's guarantee of counsel governs Defendants' conduct here, Jayne cannot "double up" on his constitutional claims by references to substantive due process.  *See id.* Accordingly, those claims are dismissed.

- 14 -

1      The Court addresses the remaining claims in turn.

2  **A.   Background**

3      The Shasta County Jail records outgoing phone calls made by inmates

4  from the jail housing facility via an automated, unmonitored system.  (Dkt. No.

5  97-6 at 2; Dkt. No. 97-12 at 2.)  Access to the recordings is limited to

6  authorized personnel; however, these calls are not routinely monitored or

7  reviewed.  (Dkt. No. 97-6 at 2; Dkt. No. 97-12 at 2.)  The recording system is

8  operated and maintained by an outside vendor, known as GTL, which handles

9  all program changes to the system, including the programming of the system (a)

10 to prevent toll charges for calls to attorneys, and (b) to prevent the recording of

11 phone calls between inmates and their attorneys.  (Dkt. No. 97-5 at 3; Dkt. No.

12 97-6 at 2; Dkt. No. 97-12 at 2; Dkt. No. 97-15 at 3.)  To protect the

13 confidentiality of attorney-client communications, the automated system can be

14 programmed with the phone numbers of attorneys who are representing inmates

15 at the facility.  (Dkt. No. 97-6 at 2; Dkt. No. 97-12 at 2.)  When properly

16 entered into the automated system, attorney telephone numbers can be removed

17 from the recording system and can also be exempted from the collect call fees

18 otherwise imposed on calls from inmates.  (Dkt. No. 97-5 at 3-4; Dkt. No. 97-6

19 at 2; Dkt. No. 97-12 at 2; Dkt. No. 97-15 at 3-4.)  It is the policy of Shasta

20 County Jail to provide inmates unmonitored, unrecorded and free calls to their

21 attorneys from the jail facilities.  (Dkt. No. 97-6 at 2; Dkt. No. 97-12 at 2.)

22 Inmates are permitted to make free, non-collect calls *only* to attorneys.  (Dkt.

23 No. 117 at  825-26.)  Because payment for collect calls must be accepted by the

24 call's recipient, voicemail machines cannot ordinarily accept collect calls.

25     On March 7, 2008, Beverly Strand, an Agency Staff Services Analyst for

26 the Shasta County Sheriff's Department, sent an e-mail to an authorized GTL

27 staff member stating that Cindy Campbell, Jayne's criminal attorney, needed to

28 be added to the "Free Access Telephone Calls" category.  (Dkt. No. 97-14 at 2.)

In her declaration, Strand states that she did not know that a separate request to remove Campbell's number from the recording system was also required.  (*Id.* at 3.)  As a result, calls from Jayne to Campell were automatically recorded by the system, even though the calls were not subject to collect charges.  (*Id.*; Dkt. No. 115-2 at 72.)  Jayne has submitted evidence that his recorded calls to Campbell included communications about defense strategy for the criminal cases that were pending against him at the time.  (Dkt. No. 1 at 16.)

On March 28, 2008, Deputy Sheriff Joiner escorted Jayne to a booking area within the jail to allow Jayne to make a call to Campbell.  (Dkt. No. 97-16 at 1.)  Because that phone is "not monitored or recorded, . . . it is sometimes used to allow inmates to call their attorneys in private."  (*Id.*)  A short time later, Sergeant Meek of the Shasta County Sheriffs Department received a complaint from Shawna Jayne, Jayne's wife or ex-wife, alleging that Jayne had made threatening calls to her in violation of a no-contact restraining order. (Dkt. No. 97-11 at 1.)  Responding to Shawna's complaint that Jayne had made several threatening phone calls to her from the jail, Meek assigned Joiner to investigate Shawna's complaint for possible disciplinary sanctions against Jayne, as such actions, if proven, would constitute jail disciplinary violations. (*Id.*; Dkt. No. 97-16 at 1-2.)

Joiner had access to the jail's telephone monitoring system and listened to recorded calls placed from Jayne's housing area to determine whether any of those calls had been made in violation of the jails' rules.  (Dkt. No. 97-16 at 2.) The only way to do so that Joiner knew of was by "identifying Jayne's voice or by the subject discussed."  (*Id.*)  One of the recordings to which Joiner listened captured Jayne leaving a voicemail to "Cindy" and informing her that he had called Shawna.  (Dkt. No. 97-16 at 2; Dkt. No. 115-2 at 77.)  Joiner declared that he did not know, at the time, that "Cindy" was Jayne's attorney.  (Dkt. No. 97-16 at 2; Dkt. No. 115-2 at 77.)  Based on Jayne's admission in this voicemail

1   that he had called Shawna, Joiner prepared a disciplinary report.  (Dkt. No. 97-
2   16 at 2.)

3        Joiner's report led to a disciplinary hearing conducted by Officer Penland
4   "regarding Mr. Jayne's alleged misuse of the telephones at the jail to place
5   improper phone calls to his ex-wife."  (Dkt. No. 97-13 at 1.)  As part of the
6   hearing process, Penland listened to the voicemail that Jayne had left for
7   "Cindy."  (*Id.* at 2.)  Penland's supervisor, Officer Heyde, also listened to the
8   voicemail.  (Dkt. No. 97-10 at 2.)  Both Penland and Heyde declared that they
9   did not know that the message had been left for Jayne's attorney.  (Dkt. No. 97-
10  10 at 2; Dkt. No. 97-13 at 2.).  After the hearing, Penland sanctioned Jayne with
11  "30 days lock down [and] loss of all privileges" based on Jayne's admission in
12  his voicemail to Campbell that he had called Shawna.  (Dkt. No. 97-13 at 2, 5.)

13       Upon learning that jail officials had listened to his phone calls to
14  Campbell, Jayne filed a jail complaint.  (Dkt. No. 115-2 at 49.)  Sergeant
15  Gonzalez was assigned to conduct an internal affairs investigation of the
16  complaint, and was assisted by Sergeant Champagne.  (Dkt. No. 97-8 at 1; Dkt.
17  No. 97-9 at 1.)  As part of the investigation, Gonzalez and Champagne sought
18  to "determine whether an inmate call to an attorney had been recorded . . . and
19  who had access to or listened to any such telephone calls."  (Dkt. No. 97-9 at 2.)
20  Gonzalez and Champagne both declared that they did not actually listen to tape
21  recordings of any calls between Jayne and Campbell.  (Dkt. No. 97-8 at 1-2;
22  Dkt. No. 97-9 at 2.)

23       Ultimately, the investigation revealed that forty-five of Jayne's phone
24  calls to Campbell had been recorded, and that eleven of these were played at
25  some point.  (Dkt. No. 115-2 at 27-29.)  The voicemail that led to Jayne's
26  disciplinary hearing before Penland numbered among those eleven recordings.
27  As for the other ten recordings that jail officials played, the record suggests that
28  they also captured free calls; like the call that led to Jayne's disciplinary

hearing, those calls cost nothing and are annotated with the phrase "call complete" rather than "call accepted" on a call detail report produced by Defendants.  (*Id.* at 30-34.)  In addition, the record suggests that at least some of those recordings captured conversations rather than voicemails; in particular, two of the recordings exceeded eight minutes in length. (*Id.* at 27-29). However, the  record does not indicate whether it was any of the Defendants, or, instead, other jail officials, who listened to the other ten recordings.

Lieutenant Ashmun was also informed that jail staff had monitored Jayne's calls to Campbell.  (Dkt. No. 97-5 at 3-4.)  She investigated the incident and documented her actions and findings in an interdepartmental memorandum. (Dkt. No. 115-2 at 61.)  According to the memorandum, Ashmun asked Champagne to play one of the recordings to confirm that the call had been made by Jayne rather than by another inmate.  (*Id.* at 62.)  Ashmun described what she heard as follows:

> We immediately heard a voice recording from the phone provider, GTL, giving notice about the call being monitored, etc.  After the recording was finished we heard a female voice saying, 'We are not available right now, please leave a message,' or something similar to this.  There was no announcement that the voice mail was for an attorney's office.  Inmate Jayne's voice came on and started talking.  He said something to the effect of 'Hey Cindy, this is Mike[.']  If I had not already known that Cindy Campbell had been his attorney I would not have known this was an attorney's office.

(*Id.*)  After hearing Jayne identify himself, Ashmun immediately had Champagne "stop the call and close the session."  (*Id.*)  She then called Campbell and played the recording for her twice so that Campbell "could hear that the voice recording from her office . . . was not heard because the GTL disclaimer talked over it."  (*Id.*)

Other jail officials, including Sergeant Mitchell, Sheriff Bosenko, and Captain Van Buskirk, were also informed of the interception of Jayne's phone calls to Campbell.  (Dkt. No. 97-6 at 2; Dkt. No. 97-12 at 1-2; Dkt. No. 97-15 at

1   4.)  Jayne stipulated that Mitchell did not listen to any of the calls, (Dkt. No.

2   115-1 at 6), and Mitchell declared that he had no involvement in the

3   investigation of the claim, (Dkt. No. 97-12 at 2).  In addition, Bosenko declared

4   that he "had no personal involvement in the recording of telephone calls or the

5   investigation of that claim"; nor did Bosenko listen to any of Jayne's recorded

6   conversations.  (Dkt. No. 97-6 at 2.)  Van Buskirk also declared that he never

7   listened to any of the contested recordings and that he did not order the

8   recordings to be made.  (Dkt. No. 97-15 at 4.)

9       Deputy District Attorney Anderson was the prosecutor assigned to handle

10  the criminal complaints filed and pending against Jayne in 2008.  (Dkt. No. 97-

11  4 at 1.)  Anderson stated that the jail notified him of Jayne's calls to Shawna

12  Jayne and that he subsequently "made contact with parole to check into this

13  investigation."  (Dkt. No. 115-2 at 53.)  Jayne's parole officer, Randy Abney,

14  informed Anderson that Shawna had complained of Jayne's calling her from jail

15  and leaving threatening messages on her answering machine.  (Dkt. No. 97-4 at

16  1-2.)  Anderson confirmed Abney's report with Shawna.  (*Id.* at 2.)  The reason

17  why Jayne was able to leave these messages appears to be as follows:

18  Previously, Joiner had allowed Jayne to make calls from a phone in the booking

19  area of the jail, presumably after Jayne represented to Joiner that he intended to

20  use that phone to call Campbell.  (Dkt. No. 97-16 at 1.)  As Joiner explained in

21  his declaration, "[t]he phone in the booking area is not monitored or recorded,

22  which is why it is sometimes used to allow inmates to call their attorneys in

23  private.  (*Id.*)  Calls made from that phone, moreover, appear to be free, thereby

24  allowing Jayne to leave voicemails for Shawna.

25      After speaking with Shawna, Anderson asked jail staff to determine if

26  any recordings had been made of Jayne's calls to Shawna, because such

27  recordings would constitute evidence supporting additional charges of criminal

28  harassment against Jayne.  (Dkt. No. 97-4 at 2.)  In response to Anderson's

1    request, jail staff prepared a CD containing recorded phone calls by Jayne.  (*Id.*)

2    Anderson asserted in his declaration that he did not ask anyone to record

3    calls between Jayne and his attorney.  (*Id.*)  According to Anderson, "[t]he CD

4    did not contain a recording of any message by Mr. Jayne left on his attorney's

5    or Cindy Campbell's message machine."  (*Id.*)  Anderson further declared that

6    he "never listened to any recording of a message or a telephone call between

7    Mr. Jayne and an attorney or between Mr. Jayne and the message machine for

8    Cindy Campbell."  (*Id.*)

9    Jayne contends that Anderson used recordings of his calls to Campbell as

10   the basis for filing additional charges against him in April 2008.  (Dkt. No. 1 at

11   3; Dkt. No. 114 at 8.)  At Jayne's bail hearing on April 2, 2008, Anderson stated

12   that the government had reason to believe that Jayne had committed "new

13   offenses."  (Dkt. No. 115-2 at 52.)  Anderson's reference to these "new

14   offenses" constituted one of several reasons he gave as to why Jayne posed a

15   danger to society, was a flight risk, and should accordingly have his bail raised

16   in his two then-open cases.  (*Id.* at 51-53.)  However, there is no information in

17   the record as to what the "new offenses" were, and no indication that Anderson

18   did file new criminal charges against Jayne based on those offenses.  In

19   response to defense attorney Campbell's concerns about the constitutionality of

20   the jail's recordings, the court clarified at the bail hearing that Anderson's

21   statements would be used only to assess Jayne's bail and not to charge him with

22   any additional crimes.  (*Id*. at 57.)  In his opposition to summary judgment,

23   Jayne states that the criminal charges filed against him "as a result of

24   information gained from the attorney client privilege" were dismissed.  (Dkt.

25   No. 114 at 39-40.)

26

27

28

1  **B.    Discussion**

2       **1.    Fourth Amendment**

3       Defendants move for summary judgment on Jayne's claim that they

4  violated his Fourth Amendment rights by recording and listening to calls he

5  made to his attorney.[5]  They argue that either there was no constitutional

6  violation or that, if there was, Defendants are entitled to absolute or qualified

7  immunity.  (Dkt. No. 97-1 at 3, 7.)

8       **a.    Absolute immunity**

9       Anderson asserts a defense of absolute immunity, arguing that his actions

10  fall within the scope of his prosecutorial authority.  (Dkt No. 97-1 at 3.); *see*

11  *Ybarra v. Reno Thunderbird Mobile Home Village*, 723 F.2d 675, 678 (9th Cir.

12  1984).  The Court, however, need not decide whether Anderson was entitled to

13  absolute immunity, because it finds that his challenged actions did not violate

14  the Constitution.  *See infra* Section IV.B.1.b.i.6.

15       **b.    Qualified immunity**

16       Qualified immunity protects government officials "from liability for civil

17  damages insofar as their conduct does not violate clearly established statutory

18  or constitutional rights of which a reasonable person would have known."

19  *Alston v. Read*, 663 F.3d 1094, 1098 (9th Cir. 2011) (quoting *Harlow v.*

20  *Fitzgerald*, 457 U.S. 800, 818 (1982)) (internal quotation marks omitted).  The

21  qualified immunity inquiry is two-pronged: the Court "must ask whether 'the

22

23  ──────────────────

24       [5] Jayne also accuses Defendants of breaching the attorney-client
    privilege, (Dkt. No. 114 at 18-20), but that analysis is inapposite here.  The

25  privilege is an evidentiary rule preventing compelled testimony from either a
    client or an attorney regarding communications about legal advice between the

26  two, not a protection against surveillance by third parties of attorney-client
    communications.  "Standing alone, the attorney-client privilege is merely a rule

27  of evidence; it has not yet been held a constitutional right."  *Clutchette v.*

28  *Rushen*, 770 F.2d 1469, 1471 (9th Cir. 1985).

1   officer's conduct violated a constitutional right' and whether 'the right was

2   clearly established' at the time of the alleged misconduct." *Id.* (quoting *Saucier*

3   *v. Katz*, 533 U.S. 194, 201 (2001), *overruled in part on other grounds by*

4   *Pearson v. Callahan*, 555 U.S. 223 (2009)).  The Court may exercise its "sound

5   discretion in deciding which of the two prongs of the qualified immunity

6   analysis should be addressed first in light of the circumstances in the particular

7   case at hand." *Pearson*, 555 U.S. at 236.  The Court begins with the first prong.

8   **i.    First prong: unconstitutional "search"**

9       The Supreme Court has set forth a two-part inquiry for determining

10  whether a warrantless search violates the Fourth Amendment: "[F]irst, has the

11  individual manifested a subjective expectation of privacy in the object of the

12  challenged search?  Second, is society willing to recognize that expectation as

13  reasonable?" *California v. Ciraolo*, 476 U.S. 207, 211 (1986) (citing *Katz v.*

14  *United States*, 389 U.S. 347, 360-61 (1967) (Harlan, J., concurring)); *see also*

15  *Kyllo v. United States*, 533 U.S. 27, 33 (2001) ("[A] Fourth Amendment search

16  occurs when the government violates a subjective expectation of privacy that

17  society recognizes as reasonable.").  "Only if both the subjective and objective

18  tests are met can we find that a Fourth Amendment interest has been violated."

19  *United States. v. Sandoval*, 200 F.3d 659, 660 (9th Cir. 2000).

20      The warrantless interception or surveillance of individuals' phone calls

21  can constitute a Fourth Amendment violation.  In *Katz*, the Supreme Court held

22  that the government's activities in "electronically listening to and recording [a

23  person's] words" spoken in a public phone booth violated the Fourth

24  Amendment.  389 U.S. at 353.  Similarly, in *United States v. United States*

25  *District Court*, the court recognized that "unsuspected governmental incursions

26  into conversational privacy which electronic surveillance entails necessitate the

27  application of Fourth Amendment safeguards."  407 U.S. 297, 313 (1972).

28

1    In addition, the Ninth Circuit has emphasized that "'there is an enhanced

2    privacy interest underlying the attorney-client relationship which warrants a

3    heightened degree of judicial protection and supervision'" when searches

4    involve attorney-client files or documents.  *DeMassa v. Nunez*, 770 F.2d 1505,

5    1507 (9th Cir. 1985) (quoting *Law Offices of Bernard D. Morley v.*

6    *MacFarlane*, 647 P.2d 1215, 1222 (Colo. 1982)).  This principle applies with

7    no less force in the context of attorney-client phone calls; the confidential

8    relationship between attorneys and clients would be no less impaired by

9    intrusions into telephone communications than they would be by the monitoring

10   of written documents.  This conclusion accords with the Ninth Circuit's

11   observation that it is "axiomatic" that the attorney-client privilege gives the

12   client "an expectation of privacy in his or her confidential *communications* with

13   the attorney."  *Id*. at 1506 (emphasis added).

14   Pretrial detainees and prisoners, however, do not enjoy the same

15   constitutional rights as unincarcerated individuals.  "The fact of confinement as

16   well as the legitimate goals and policies of the penal institution" limit the

17   constitutional rights that detainees and prisoners retain.  *Bell*, 441 U.S. at 546.

18   Consistent with this principle, the Ninth Circuit has held that an expectation of

19   privacy in outbound calls from prison is not objectively reasonable, and that the

20   recording of such calls does not violate the Fourth Amendment.  *United States*

21   *v. Van Poyck*, 77 F.3d 285, 290-91 (9th Cir. 1996).  Nevertheless, the *Van*

22   *Poyck* court specifically excepted from its analysis "'properly placed' telephone

23   calls between a defendant and his attorney."  *Id.* at 291 n.9; *see also United*

24   *States v. Willoughby*, 860 F.2d 15, 20 (2d Cir. 1988) ("[W]e rejected a Fourth

25   Amendment attack on the interception of telephone calls made by certain

26   convicted prisoners, ruling that they had no reasonable expectation of privacy in

27   their calls to *nonattorneys* on institutional telephones.") (emphasis added).  *Van*

28   *Poyck*'s qualification accords with the principle that "inmates' . . . rights

1    pertaining to privileged correspondence are 'not inconsistent with [their] status

2    as . . . prisoners or with the legitimate penological objectives of the correctional

3    system.'"  *Gomez v. Vernon*, 255 F.3d 1118, 1133 (9th Cir. 2001) (quoting *Pell*

4    *v. Procunier*, 417 U.S. 817, 822 (1974)).

5        Here, the record establishes that Jayne had an objectively reasonable

6    expectation of privacy in his telephone communications with Campbell, despite

7    his status as a pretrial detainee.  Significantly, the Shasta County Jail had a

8    "policy of . . . provid[ing] inmates unmonitored, unrecorded, and uncharged

9    phone calls to their attorneys."  (Dkt. No. 97-6 at 2.)  To implement this policy,

10   the jail maintained a phone system with the capacity automatically to remove

11   calls from an inmate to a recognized attorney's number from both the recording

12   system and the collect-call charge system.  (Dkt. No. 97-5 at 3; Dkt. No. 97-6 at

13   2; Dkt. No. 97-12 at 2; Dkt. No. 97-15 at 3.)  In addition, the jail made available

14   to inmates a list of Shasta County Public Defenders who could be contacted for

15   legal assistance; calls to those defenders were to be free and unrecorded.  (Dkt.

16   No. 115-2 at 23; Dkt. No. 117 at 850.)  Campbell's name and number were

17   included on that list.  (Dkt. No. 115-2 at 23.)  The jail's policy of not recording

18   or monitoring attorney-client calls conferred upon Jayne an objectively

19   reasonable expectation that his calls to Campbell would be private.

20       In addition, Jayne has sufficiently established a subjective expectation

21   that his calls to Campbell would remain private.  On March 5, 2008, Jayne

22   requested in writing to prison officials that Campbell's number be added to the

23   system so that he could "speak to her confidentially like other conflict lawyers."

24   (Dkt. No. 115-2 at 37.)  Jayne's request demonstrates a subjective expectation

25   that his calls to Campbell would be unrecorded and unmonitored.  Jayne has

26   also submitted a declaration stating, "I did not consent to anyone listening to

27   my attorney client phone calls ever."  (Dkt. No. 115-2 at 93.)  He likewise

28

- 24 -

1    specified that he "never gave consent implied or otherwise to having [his]

2    attorney client calls recorded by the jail." (*Id*.)

3         Because Jayne had an objectively reasonable and subjective expectation

4    of privacy in his calls to Campbell, summary judgment must be denied as to any

5    defendants who recorded or listened to those calls.

### 1.    Meek

7         Jayne has provided evidence that Meek had access to the GTL system,

8    and that, upon receiving Shawna's complaint, she initiated an investigation that

9    ultimately led to the alleged monitoring of his attorney-client conversations.

10   (Dkt. No. 115-2 at 83; Dkt. No. 97-11 at 1.)  Meek, however, has submitted a

11   declaration stating that she did not monitor or listen to Jayne's calls, nor did she

12   order Jayne's attorney-client calls to be recorded, intercepted, or overheard.

13   (Dkt. No. 97-11 at 2.)  Jayne has failed to provide any evidence that contradicts

14   Meek's declaration.  There is thus no triable issue of fact as to whether she

15   violated Jayne's Fourth Amendment rights by recording or listening to the calls

16   in question, and summary judgment is granted to Meek.  *See Anderson*, 477

17   U.S. at 252.

### 2.    Ashmun, Gonzalez, and Champagne

19        Jayne next argues that Lieutenant Ashmun, with the assistance of

20   Sergeants Gonzalez and Champagne, violated his rights by conducting an

21   internal affairs investigation regarding the interception of his attorney-client

22   calls.  (Dkt. No. 114 at 5-6.)  Jayne alleges that in the process of conducting the

23   investigation, these defendants listened to his confidential phone calls to

24   Campbell without his consent.  (Dkt. No. 114 at 13-14.)  However, these three

25   Defendants each declare that they were not involved in the recording of Jayne's

26   calls; nor did they listen to the content of any of Jayne's voicemails or calls.

27   Sergeant Gonzalez declared that, prior to his investigation, he had no

28   involvement in the call monitoring process at the jail and that he did not listen

to the voicemail left to Campbell.  (Dkt. No. 97-9 at 2.)  Sergeant Champagne declared that he determined which of Jayne's calls had been recorded and who had accessed those recordings, but did not listen to any calls.  (Dkt. No. 97-8 at 2.)  In an interdepartmental memorandum in which she documented her investigation into whether Jayne's calls to Campbell had been recorded, Ashmun stated that she listened to the greeting of Campbell's voicemail and Jayne's response to that greeting but had Champagne stop the recording immediately thereafter.  (Dkt. No. 115-2 at 62.)  She then called Campbell to alert her that the GTL phone system disclaimer spoke over the voice recording from Campbell's office identifying it as a law office.  (Dkt. No. 115-2 at 62.)  Although Jayne makes allegations to the contrary, he has failed to provide any evidence supporting these allegations.  There is therefore no genuine issue of material fact as to whether Ashmun, Gonzalez, or Champagne recorded or listened to the calls.

### 3.     Mitchell

Jayne stipulates that Sergeant Mitchell at no time listened to any recording of any call placed by Jayne, but alleges that Mitchell, in his capacity as a supervisor, authorized numerous users at the jail to access the system to monitor Jayne's attorney-client phone conversations.  (Dkt. No. 115-1 at 6.)  Because Jayne has stipulated that Mitchell did not listen to his calls, because he has provided no evidence that Mitchell authorized the recordings, and because respondeat superior liability is unavailable under § 1983, *see Monell*, 436 U.S. at 691, Jayne has failed to establish an issue of triable fact as to this defendant.

### 4.     Heyde, Penland, and Joiner

Penland, Heyde, and Joiner each admit listening to some or all of the voicemail Jayne left for Campbell, but assert that they were unaware that Campbell was an attorney and that the phone call was subject to the attorney-client privilege.  (Dkt. No. 97-10 at 2; Dkt. No. 97-13 at 2; Dkt. No. 97-16 at 2.)

1  Specifically, they state that no information was included in the recording to

2  identify the message as being left on an attorney's phone, as Campbell's

3  greeting identified her as "Cindy."  (Dkt. No. 97-10 at 2; Dkt. No. 97-13 at 2;

4  Dkt. No. 97-16 at 2.)  Jayne disputes that their listening was unintentional but

5  provides no evidence that the recording captured Campbell's announcement

6  indicating that the caller had reached a law office.  (Dkt No. 114 at 33-35.)  To

7  the contrary, Defendants have submitted a report from Ashmun documenting

8  her investigation of why Jayne's calls to Campbell were recorded.  (Dkt. No.

9  115-2 at 62.)  Ashmun noted in that report that the GTL disclaimer "talked

10 over" the voice recording from Campbell's office, such that the portion of the

11 recording identifying Campbell's association with a law office could not be

12 heard.  (Dkt. No. 115-2 at 62.)

13        Jayne, however, also argues that Heyde, Penland, and Joiner knew or

14 should have known that under the GTL system, voicemails can only be left on

15 pre-approved attorney lines. (Dkt. No. 114 at 34.)  He contends that these

16 Defendants knew or should have known that the only non-collect calls from the

17 jail are those placed to attorneys; because the recording in question did not

18 begin with an announcement that the call was being billed as a collect call from

19 the jail, any reasonable official should have known that the recording

20 Defendants listened to was an attorney call.  (Dkt. No. 114 at 34-35.)  Jayne has

21 put forth evidence to suggest that the only person to whom he could have made

22 a free, non-collect call, and therefore for whom he could have left a voicemail,

23 is an attorney.  (Dkt. No. 117 at 823-26.)  He also has submitted evidence of a

24 written inmate request form to have the number of his "appointed conflict

25 lawyer Cindi [sic] Campbell" added to the system in order to "speak to her

26 confidentially."  (Dkt. No. 115-2 at 37.)  In addition, Jayne has provided

27 evidence that jail officials made available to inmates a list of public defenders

28 who could be reached for legal assistance.  (Dkt. No. 115-2 at 23.)  Calls to

those defense attorneys were to be free and unrecorded, and Campbell's name

and number were on that list.  (Dkt. No. 115-2 at 23; Dkt. No. 117 at 850.)

Thus, the question is whether Defendants knew or should have known that the

voicemail to "Cindy" was a voicemail to Jayne's attorney.

This inquiry follows from the principle that "[t]he touchstone of our

analysis under the Fourth Amendment is always 'the reasonableness in all the

circumstances of the particular governmental invasion of a citizen's personal

security.'"  *Pennsylvania v. Mimms*, 434 U.S. 106, 108-09 (1977) (quoting

*Terry v. Ohio*, 392 U.S. 1, 19 (1968)).  Where the existence of a Fourth

Amendment violation turns on an official's factual knowledge, the Ninth

Circuit has interpreted the reasonableness inquiry to require an assessment of

whether that official had or should have had the requisite knowledge.

In *Torres v. City of Madera*, for example, the court addressed whether a

defendant officer applied unreasonable force when she shot an arrestee with a

semiautomatic pistol that she mistook to be her taser.  648 F.3d 1119 (9th Cir.

2011).  The court held that, if the officer "knew or should have known that the

weapon she held was a Glock rather than a Taser, and thus had been aware that

she was about to discharge deadly force on an unarmed, non-fleeing arrestee

who did not pose a significant threat of death or serious physical injury to

others, then her application of that force was unreasonable."  *Id*. at 1124.

"Where an officer's particular use of force is based on a mistake of fact," the

Ninth Circuit explained, "we ask whether a reasonable officer would have or

should have accurately perceived that fact."  *Id*. (citing *Jensen v. City of

Oxnard*, 145 F.3d 1078, 1086 (9th Cir. 1998) (deciding that the mistaken

shooting of a fellow police officer was unreasonable if, based on the

circumstances, the defendant officer should have been able to recognize the

victim at the time of the shooting); *accord Henry v. Purnell*, 652 F.3d 524, 532

(4th Cir. 2011) (reversing summary judgment for the defendant officer on a

Fourth Amendment excessive force claim where "[t]here were several facts that [the officer] knew or should have known that would have alerted any reasonable officer to the fact that he was holding his Glock" rather than his taser); *see also Humphrey v. Mabrey*, 482 F.3d 840, 846-47 (6th Cir. 2007) (concluding that "the use of force to effect a seizure after officers knew or should have known that they had the wrong person is inherently unreasonable" under the Fourth Amendment); *Waterman v. Batton*, 393 F.3d 471, 482 (4th Cir. 2005) (holding that a reasonable juror could conclude that officers who pursued a vehicle "knew or should have known" that the vehicle had passed them without veering in their direction, and that the juror could thus conclude that any continuing belief on the part of the officers that they still faced an imminent threat of serious physical harm would have been unreasonable); *Liston v. County of Riverside*, 120 F.3d 965, 978-79 (9th Cir. 1997) (reversing summary judgment for defendant officers on a Fourth Amendment unreasonable detention claim because a reasonable jury could conclude that the detention persisted well beyond the time when a reasonable officer "would have known" that they had the wrong people in custody).

Of particular significance here, the Ninth Circuit has applied the "knew or should have known" standard in the Fourth Amendment search and seizure context when assessing the reasonableness of officers' factual mistakes.  The court held in *Navarro v. Barthel* that the correct reasonableness standard for determining whether officers violated the Fourth Amendment in searching the wrong location is "whether the officers knew or should have known that a mistake had been made in designating the place to be searched."  952 F.2d 331, 332 (9th Cir. 1991).  The Supreme Court also articulated this standard in *Maryland v. Garrison*, when it upheld a search as constitutional on the basis that the officers executing the search neither knew nor should have known that the defendant's residence covered only part of an apartment floor.  480 U.S. 79,

85 (1987).  Although *Navarro* and *Garrison* involved the mistaken search of a place rather than the mistaken search of a thing, this is a difference without a distinction.  *See United States v. Gamez-Orduno*, 235 F.3d 453, 458 (9th Cir. 2000) (explaining that a plaintiff asserting a Fourth Amendment violation must demonstrate an objectively reasonable expectation of privacy "in the place searched *or* the thing seized") (emphasis added); *see also United States v. Johns*, 948 F.2d 599, 604 (9th Cir. 1991) (stating that an officer who submits an affidavit to secure a search warrant cannot avoid liability under the Fourth Amendment "when the magistrate was misled by information in the affidavit the affiant knew or should have known was false"); *United States v. Hughes*, 441 F.2d 12, 18 n.18 (5th Cir. 1971) (distinguishing a case in which the court held that officers had undertaken an unreasonable search on the basis that, in that case, "the police knew or should have know that the cabinet [searched] did not belong to appellant's daughter," who had consented to the search).

Here, as in *Torres* and *Navarro*, Defendants argue that their intrusion was based on a factual error: they mistook Jayne's attorney-client communication to be an ordinary, non-privileged communication.  The Court therefore must determine whether there is a triable issue as to whether Joiner, Penland, and Hyde mistook—and, if so, whether they *reasonably* mistook—the contested voicemail to be a non-attorney-client communication.  In doing so, the Court takes heed of the Ninth Circuit's admonition that "[n]ot all errors in perception or judgment . . . are reasonable," *Torres*, 648 F.3d at 1124, in the context of assessing whether officers have committed a Fourth Amendment violation.

Joiner admits in his declaration that one of the calls he listened to while conducting his investigation "was a voice mail message that Mr. Jayne had left for someone named 'Cindy,'" (Dkt. No. 97-16 at 2), but testified that "[t]here was no last name in the call," (Dkt. No. 117 at 174.)  Joiner said that he did not know that "Cindy" was Jayne's attorney, but rather assumed that "it was some

girl named Cindy." (*Id.* at 211.)  He also testified that the call consisted of Jayne "leaving a message.  Because there was nobody else on the line." (*Id.* at 176.)  When questioned about inmates' ability to make non-collect calls and leave voicemails for persons other than attorneys, Joiner stated that he did not know if the GTL system limited inmates calls in that way.  (*Id.* at 215.)  In addition, Joiner stated in his interview with Gonzalez, who was investigating the recordings of Jayne's phone calls, that he did not know that Campbell was Jayne's attorney.  (Dkt. No. 115-2 at 77.)

Penland served as the hearing officer who conducted the disciplinary hearing regarding the harassing calls that Jayne allegedly placed to Shawna. (Dkt. No. 97-13 at 1.)  As part of that investigation, he listened to a voicemail left on "Cindy's" phone.  (*Id.* at 2.)  Penland stated that, at the time, he did not know that "Cindy" was Jayne's attorney or that the call was subject to attorney-client privilege.  (*Id.*)  Like Joiner, Penland also stated during his interview with Gonzalez that he did not know that Campbell was Jayne's attorney.  (Dkt. No. 115-2 at 73.)

Penland's training supervisor at the time, Heyde, testified that he "did not listen to a call specifically on Cindy Campbell's voicemail." (Dkt. No. 117 at 832, 850.)  Heyde testified that he missed the beginning of the recording, so he did not know whom Jayne had called.  (*Id.* at 832-33.)  He also attested that Joiner never identified the call as one to an attorney, and instead identified it as one made in violation of Jayne's restraining order.  (*Id.* at 837.)  In his interview with Gonzalez, Heyde stated that he did not know that Campbell was Jayne's attorney and that nothing in the recorded call indicated that "Cindy" was an attorney.  (Dkt. No. 115-2 at 76.)  Heyde acknowledged that only pre-approved calls to attorneys are not subject to GTL's collect-call charge (*Id.* at 826, 832), but stated that, at the time, he did not think it odd that he had listened to a voicemail or that he had listened to a free call (*Id.* at 832).

The Ninth Circuit has held that "'[q]uestions involving a person's state of mind, e.g., whether a party knew or should have known of a particular condition, are generally factual issues inappropriate for resolution by summary judgment.'" *FTC v. Network Servs. Depot, Inc*., 617 F.3d 1127, 1139 (9th Cir. 2010) (quoting *Braxton–Secret v. A.H. Robins Co.*, 769 F.2d 528, 531 (9th Cir. 1985)). In other words, "'summary judgment should not be granted where contradictory inferences may be drawn from [the] facts.'" *Id.* (quoting *Braxton–Secret*, 769 F.2d at 531). Jayne has submitted evidence that jail officials knew that "Cindy Campbell" was a public defender whom inmates could call free of charge. (Dkt. No. 115-2 at 23.) In addition, he has adduced evidence creating a reasonable inference that voicemails can be left *only* for attorneys, because, under the jail's policies, inmates can make free, non-collect calls only to attorneys. (Dkt. No. 117 at 826.) Because payment for collect calls must be accepted by the call's recipient, voicemail machines cannot ordinarily accept collect calls. Together, these facts support a reasonable inference that Joiner, Penland, and Heyde knew or should have known that the recording of Jayne's voicemail to "Cindy" was, in fact, a message to his attorney.[6]

---

[6] There is no independent state of mind requirement in a § 1983 claim. *Daniels v. Williams*, 474 U.S. 327, 329-30 (1986); *Tennison v. City and Cnty. of San Francisco*, 570 F.3d 1078, 1088 (9th Cir. 2009). A plaintiff must only prove that the defendant had the state-of-mind "necessary to state a violation of the underlying constitutional right." *Daniels*, 474 U.S. at 330; *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 405 (1997). "[I]n Fourth Amendment violations claims a plaintiff must prove that the official conduct was 'unreasonable.'" *Howard v. Grinage*, 82 F.3d 1343, 1350 (6th Cir. 1996). Here, if Defendants Heyde, Joiner, and Penland knew that "Cindy" was Jayne's attorney, or if they should have known the call was to Jayne's attorney because the GTL system allows free calls only to attorneys, (Dkt. No. 117 at 826), then their conduct was unreasonable.

1    Jayne has therefore established a triable issue of fact as to whether these

2   defendants violated his Fourth Amendment rights.

3                    **5.    Van Buskirk, Bosenko, and Ashmun**

4       Jayne argues that Captain Van Buskirk, Sheriff Bosenko, and Lieutenant

5   Ashmun violated his rights by ordering the recording of his attorney-client

6   calls.  Jayne's only support for this claim is that Van Buskirk, Bosenko, and

7   Ashmun are policy makers at the jail.  Jayne fails to put forth any facts that are

8   not conclusory to challenge Defendants' evidence that the policy of the jail is

9   not to record or charge for calls to specified attorney phone numbers. (Dkt. No.

10  97-5 at 3; Dkt. No. 97-6 at 2; Dkt. No. 97-15 at 3-4.)  Jayne stipulates that

11  Captain Van Buskirk and Sheriff Bosenko did not listen to the recording in

12  question.  (Dkt. No. 115-1 at 23-24.)  The Court found previously that there is

13  no genuine dispute of facts as to whether Ashmun recorded or listened to the

14  contents of the calls.  Because they did not directly listen to the calls, or order

15  that the calls be recorded, and because respondeat superior liability is

16  unavailable under § 1983, *see Monell*, 436 U.S. at 691, Jayne has failed to

17  establish a triable  issue of fact as to whether Van Buskirk, Bosenko, and

18  Ashmun, in their role as policy makers, violated his Fourth Amendment rights.

19                              **6.    Anderson**

20      Jayne contends that Deputy District Attorney Eric Anderson interfered

21  with his rights by recording and listening to communications between him and

22  Campbell.  (Dkt. No. 1 at 3; Dkt. No. 114 at 8.)  He first alleges that, upon

23  Anderson's instructions, his calls to Campbell were listened to and then "used

24  as evidence to find Mr. Jayne guilty in a jail misconduct report."  (Dkt. No. 114

25  at 7-8.)  Jayne also alleges that the privileged call described in the jail report

26  was sent to the prosecutor as part of a CD that contained attorney-client

27  communications, and that Anderson used the content of those calls to file a new

28  criminal case against him (since dismissed).  (*Id*. at 8.)

1     But Anderson has declared, "The CD did not contain a recording of any

2     message by Mr. Jayne left on his attorney's or Cindy Campbell's message

3     machine."  (Dkt. No. 97-4 at 2.)  Anderson further stated that he "never listened

4     to any recording of a message or a telephone call between Mr. Jayne and an

5     attorney or between Mr. Jayne and the message machine for Cindy Campbell."

6     (*Id.*)  In addition, Anderson asserted that he "did not ask anyone at the jail to

7     record or attempt to record any phone calls between Mr. Jayne and his

8     attorneys."  (*Id.*)

9     Other than bare allegations, Jayne fails to provide any evidence that

10    Anderson in fact listened to any of his attorney-client communications.  There

11    is nothing in the record that contradicts Anderson's declaration; Jayne fails to

12    substantiate in any way his assertion that Anderson listened to the voicemail to

13    Campbell in which Jayne mentioned having called Shawna.  Jayne has not

14    provided a copy of the CD to the Court nor any other proof that Anderson heard

15    the voicemail that Joiner heard.  Jayne thus fails to raise a triable issue of fact as

16    to whether Anderson violated his Fourth Amendment rights.

17             **ii.      Second prong: clearly established law**

18             Defendants are not entitled to qualified immunity if it was "clearly

19    established" that Jayne had a reasonable expectation of privacy in his calls from

20    prison to his criminal attorney.  *See Ortega v. O'Connor*, 146 F.3d 1149, 1154

21    (9th Cir. 1998).  To determine "whether the constitutional right was clearly

22    established at the time of the conduct[,] we ask whether its contours were

23    'sufficiently clear' that every 'reasonable official would have understood that

24    what he is doing violates that right.'"  *Mattos v. Agarano*, 661 F.3d 433, 442

25    (9th Cir. 2011) (quoting *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2083,  — U.S. —

26    (2011)).  In other words, a right is clearly established when "existing precedent

27    [has] placed the statutory or constitutional question beyond debate."  *Id.*

28    (internal quotation marks omitted).

1    At the same time, there need not be "a case directly on point" in order for

2 the law to be clearly established. *Id.* (internal quotation marks omitted).

3 Instead, "[t]he Supreme Court has made 'clear that officials can still be on

4 notice that their conduct violates established law even in novel factual

5 circumstances.'" *Id.* (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)).  This

6 principle is particularly important when courts address Fourth Amendment

7 cases, where the constitutional standard of reasonableness is always a very

8 fact-bound inquiry. *Id.*  "If qualified immunity provided a shield in all novel

9 factual circumstances, officials would rarely, if ever, be held accountable for

10 their unreasonable violations of the Fourth Amendment." *Id.* (citing *Deorle v.*

11 *Rutherford*, 272 F.3d 1272, 1286 (2001)).  "Otherwise, officers would escape

12 responsibility for the most egregious forms of conduct simply because there

13 was no case on all fours prohibiting that particular manifestation of

14 unconstitutional conduct." *Deorle*, 272 F.3d at 1286.

15    Here, there is no case directly holding that pretrial detainees have a

16 reasonable expectation of privacy in their phone calls to their attorneys.

17 Nevertheless, any reasonable official should have known that listening to

18 Jayne's calls to Campbell would violate the Fourth Amendment.  In *Van Poyck*,

19 the Ninth Circuit explicitly qualified its holding that inmates lack a reasonable

20 expectation of privacy in their outbound telephone calls by noting that the same

21 analysis "does not apply to 'properly placed' telephone calls between a

22 defendant and his attorney," 77 F.3d at 291 n.9; *see also Willoughby*, 860 F.2d

23 at 20 ("[W]e rejected a Fourth Amendment attack on the interception of

24 telephone calls made by certain convicted prisoners, ruling that they had no

25 reasonable expectation of privacy in their calls to *nonattorneys* on institutional

26 telephones.") (emphasis added); *Smith v. Shimp*, 562 F.2d 423, 427 (7th Cir.

27 1977) (holding that jail officials do not violate inmates' Fourth Amendment

28 rights when they inspect inmates' "outgoing *nonprivileged* mail") (emphasis

added).  Each court thereby articulated an understanding that incarcerated

individuals retain an objectively reasonable expectation of privacy in calls to

their attorneys.  This understanding is consistent with the principle that

prisoners and detainees "do not forfeit all their privacy rights at the jailhouse

steps," although those rights may be curtailed.  *Van Poyck*, 77 F.3d at 291.  As

the Supreme Court has recognized, "there must be mutual accommodation

between institutional needs and objectives and the provisions of the

Constitution."  *Wolff v. McDonnell*, 418 U.S. 539, 556 (1974).

That inmates do retain an objectively reasonable expectation of privacy

in telephone communications with their attorneys finds clear support in a wide

range of precedent existing at the time of the alleged violations here.  As an

initial matter, "inmates' . . . rights pertaining to privileged correspondence are

'not inconsistent with [their] status as . . . prisoners or with the legitimate

penological objectives of the correctional system.'"  *Gomez*, 255 F.3d at 1133

(quoting *Pell*, 417 U.S. at 822).  In addition, an expectation of privacy is

objectively reasonable if it derives from "'a source outside of the Fourth

Amendment, either by reference to concepts of real or personal property law or

to understandings that are recognized and permitted by society.'"

*Gamez-Orduno*, 235 F.3d at 458 (quoting *Rakas v. Illinois*, 439 U.S. 128,

143-44 (1978)).  The Ninth Circuit has held that protections in "federal and

state statutes, in codes of professional responsibility, under common law, and in

the United States Constitution" rendered clients' expectation of privacy in their

attorneys' files objectively reasonable.  *DeMassa*, 770 F.2d at 1506.  Here,

similar sources unequivocally established the objective reasonableness of

Jayne's expectation of privacy in his phone communications to Campbell.

To begin, constitutional guarantees retained by incarcerated individuals

support the legitimacy of Jayne's expectation of privacy.  The Ninth Circuit has

maintained that "[t]o the extent that the right to effective assistance of counsel

in a separate criminal case is at stake, the Sixth Amendment provides [a] 'source' and 'understanding' of [an objectively reasonable] expectation of privacy." *Id.* at 1507.  There is no question that inmates retain the right to effective assistance of counsel in "all criminal prosecutions," U.S. Const. amend. VI; *see, e.g.*, *Casey v. Lewis*, 4 F.3d 1516 (9th Cir. 1993), and "government interference with the confidential relationship between a defendant and his counsel may implicate Sixth Amendment rights," *Clutchette*, 770 F.2d at 1471.  This principle applies with equal force to pretrial detainees, as reflected in courts' recognition that "[d]etainees' right to counsel and due process can . . . be compromised by a lack of privacy in consultations with counsel."  *Johnson-El v. Schoemehl*, 878 F.2d 1043, 1052 (8th Cir. 1989).  Indeed, the Eighth Circuit has held that jail officials' alleged role in making it impossible for pretrial detainees privately to consult with attorneys by phone would, if true, violate clearly established rights.  *See id.* at 1052-53.  In so holding, the court explained:

> Forcing prisoners to conduct their meetings with their attorneys in the open or to yell over the phone obviously compromises the consultation.  Detainees might be hesitant to disclose names and information relevant to the attorney's investigation and necessary to the advice sought.  Often pleas are changed in the months before trial based on counsel's assessment of the strength of each side's case.  The right to an attorney would mean little if it did not effectively attach until the hushed whispers at the defense table the morning of trial, after counsel has selected her strategy and witnesses.  Thus, as we have already stated, [i]t is clear that an accused does not enjoy the effective aid of counsel if he is denied the right of private consultation with him.

*Id*. at 1052 (internal quotation marks omitted); *see also Greater Newburyport Clamshell Alliance v. Public Serv. Co. of N.H.*, 838 F.2d 13, 21 (1st Cir. 1988) ("[U]tmost candor between an attorney and client is essential to effective assistance of counsel."); *United States v. Rosner*, 485 F.2d 1213, 1224 (2d Cir. 1973) ("[T]he essence of the Sixth Amendment right is, indeed, privacy of communication with counsel.").  At the time of the alleged violations, Jayne had

1  criminal charges pending against him, and Campbell was serving as his public

2  defender with respect to those charges.  Jayne's right to effective assistance from

3  his criminal defense attorney, as guaranteed by the Sixth Amendment, thus gave

4  rise to an unambiguously reasonable expectation of privacy in his

5  communications with Campbell.  *See also DeMassa*, 770 F.2d at 1507 ("Because

6  the Fifth Amendment's protection against testimonial self-incrimination may be

7  threatened by the act of disclosure of legal files, that constitutional guarantee

8  also supports the clients' legitimate expectations of privacy.").

9         The clear contours of Jayne's reasonable expectation of privacy in his

10  calls to Campbell also finds support in state law, even though violations of state

11  law do not necessarily translate into Fourth Amendment violations, *see Virginia*

12  *v. Moore*, 553 U.S. 164, 168-170 (2008).  Notably, the California Supreme Court

13  invalidated the state Department of Corrections' rules permitting inspection of

14  inmate attorney-client correspondence.  In doing so, it explained, "A long line of

15  cases firmly establishes the general principle that a prisoner has a right to consult

16  with his attorney in absolute privacy."  *In re Jordan*, 500 P.2d 873, 879 (Cal.

17  1972) (citing cases)); *accord People v. Urbano*, 128 Cal. App. 4th 396, 402-03

18  (2005).  As the *Jordan* court explained, the contested prison regulations "abridge

19  the statutory right to refuse to disclose the contents of a confidential

20  communication between a client and his attorney"; they moreover infringe on

21  inmates' right under the California Penal Code to be free of deprivations that are

22  not reasonably related to legitimate penological interests.  *Id.* at 875 (citing Cal.

23  Evid. Code §§ 952, 954; Cal. Penal Code § 2600)); *see also* Cal. Penal Code §

24  636(a) ("Every person who, without permission from all parties to the

25  conversation, eavesdrops on or records, by means of an electronic device, a

26  conversation, or any portion thereof, between a person who is in the physical

27  custody of a law enforcement officer or other public officer . . . and that person's

28  attorney . . . is guilty of a felony punishable by imprisonment . . . .").  Because

1    Shasta County Jail is located in California, California law buttresses the

2    reasonableness of Jayne's expectation that his communications with Campbell

3    would be private.

4          The doctrine of attorney-client privilege also contributes to the well-

5    established nature of Jayne's expectation of privacy in his calls to Campbell.

6    The attorney-client privilege is the oldest privilege for confidential

7    communications known to the common law. *See Upjohn v. Co. v. United States*,

8    449 U.S. 383, 389 (1981).  It is, moreover, a privilege to which incarcerated

9    individuals remain entitled.  "[T]o conclude that the reduced privacy required by

10   penological necessity renders it impossible for inmates to keep privileged

11   [information] confidential . . . would undermine a critical component of the right

12   of access to the courts, namely, the opportunity to receive privileged

13   communications from counsel." *Gomez*, 255 F.3d at 1133.  That the privilege is

14   an evidentiary one does not render it irrelevant to Jayne's reasonable expectation

15   of privacy in his attorney-client communications.  On the contrary, the Ninth

16   Circuit has held in the Fourth Amendment context that "[i]t is axiomatic" that

17   the privilege confers upon a client "an expectation of privacy in his or her

18   confidential communications with the attorney." *DeMassa*, 770 F.2d at 1506

19   (citing authorities); *accord In re Osterhoudt*, 722 F.2d 591, 593 (9th Cir. 1983)

20   (explaining that the purpose of the privilege is "to protect every person's right to

21   confide in counsel free from apprehension of disclosure of confidential

22   communications").  The Seventh Circuit has similarly explained that "[t]he basis

23   for the privilege is to afford the client a reasonable expectation of privacy and

24   confidentiality with regard to disclosures made during the course of consultation

25   with his attorney." *In re January 1976 Grand Jury*, 534 F.2d 719, 728 (7th Cir.

26   1976); *see also Trammel v. United States*, 445 U.S. 40, 51 (1980) (explaining

27   that the privilege "rests on the need for the advocate and counselor to know all

28   that relates to the client's reasons for seeking representation if the professional

1   mission is to be carried out"); *Bittaker v. Woodford*, 331 F.3d 715, 723 n.7 (9th

2   Cir. 2003) (suggesting that the attorney-client privilege helps to ensure a

3   defendant's Sixth Amendment right to "*effective* assistance" of counsel).  That

4   inmates are entitled to invoke the attorney-client privilege reflects society's clear

5   willingness to recognize the reasonableness of even incarcerated individuals'

6   expectations of privacy in their attorney-client communications.

7          Turning to the particular facts of this case, any official should have been

8   on notice that listening to recordings of Jayne's calls to Campbell was

9   impermissible.  In particular, the record establishes that Shasta County Jail had a

10  "policy of . . . provid[ing] inmates unmonitored, unrecorded, and uncharged

11  phone calls to their attorneys."  (Dkt. No. 97-6 at 2.)  Bosenko, the Sheriff of

12  Shasta County, acknowledged the existence of this policy in his declaration.

13  (Dkt. No. 97-6 at 2.)  The uncontroverted facts also show that jail officials

14  actively implemented this policy through their use of the GTL phone system that

15  automatically removed calls from inmates to recognized attorneys' numbers

16  from both the recording system and the collect-call charge system.  (Dkt. No. 97-

17  5 at 3; Dkt. No. 97-6 at 2; Dkt. No. 97-12 at 2; Dkt. No. 97-15 at 3.)  Inmates

18  could request that attorneys' numbers be added to the no-recording list, which

19  Jayne did with respect to Campbell.  (Dkt. No. 115-2 at 37.)  In addition, the

20  Sheriff's Department had an employee whose duties included adding attorneys

21  to that list (Dkt. No. 97-14 at 2.), and jail officials even made available to

22  inmates a list of Shasta County Public Defenders, including Campbell, who

23  could be contacted for legal assistance (Dkt. No. 115-2 at 23.).

24         The clearly established nature of Jayne's right to privacy in his calls to

25  Campbell is further substantiated by consistent statements by individual

26  Defendants that they would not have knowingly listened to Jayne's calls to an

27  attorney.  For example, Heyde, Joiner, and Penland all declared that, had they

28  known that Jayne's voicemail to "Cindy" was to his attorney, they would not

1   have listened to the call.  (Dkt. No. 97-10 at 2; Dkt. No. 97-13 at 2; Dkt. No. 97-

2   16 at 2.)  Heyde testified that he was aware of "an absolute expectation of

3   privacy with attorney-client phone calls."  (Dkt. No. 117 at 838.)  Joiner also

4   stated that the phone in the booking area, where he had escorted Jayne on at least

5   one occasion, is used by "inmates to call their attorneys in private" because it "is

6   not monitored or recorded."  (Dkt. No. 97-16 at 1.)  Van Buskirk recognized that

7   it was a "technical violation of the law" for his officers to have "listened to a

8   recorded call from the jail by Inmate Jayne to Public Defender Cindy

9   Campbell's voice mail."  (Dkt. No. 115-2 at 71.)  In sum, Defendants' reactions

10  to the intrusions into Jayne's attorney-client communications reflect that they

11  did recognize, as any reasonable officer would have, the objective

12  reasonableness of Jayne's expectation of privacy in his calls from jail to his

13  criminal attorney.

14       In short, it is "clearly established" that pretrial detainees have a reasonable

15  expectation of privacy in phone calls to their attorneys, especially when a prison

16  has an actual policy of not recording or listening to such calls.  Defendants are

17  therefore not entitled to qualified immunity for Jayne's claims on this issue.  The

18  motion for summary judgment on Jayne's Fourth Amendment claim is denied as

19  to Defendants Heyde, Penland, and Joiner and granted as to Defendants

20  Ashmun, Gonzalez, Champagne, Bosenko, Van Buskirk, Meek, Mitchell, and

21  Anderson.

22       **2.     6th Amendment**

23       Jayne next contends that Anderson violated his Sixth Amendment right to

24  counsel by listening to his calls to Campbell and using them as a basis for

25  bringing additional criminal charges against him.  (Dkt. No. 114 at 8.)  He also

26  alleges that the jail personnel recorded, listened to, and used the content of these

27  calls (specifically, his admission that he had called Shawna despite the no-

28                                   - 41 -

1    contact order) against him in a disciplinary proceeding, and that these actions

2    likewise violated his right to counsel.  (Dkt. No. 114 at 7-8.)

3          As before, the Court chooses to begin with the first prong of the qualified

4    immunity inquiry: whether Defendants violated Jayne's Sixth Amendment right

5    to assistance of counsel.  The Ninth Circuit has held that "mere government

6    intrusion into the attorney-client relationship . . . is not of itself violative of the

7    Sixth Amendment right to counsel."  *United States v. Irwin*, 612 F.2d 1182,

8    1186-87 (9th Cir. 1980).  In order to defeat summary judgment, Jayne must

9    adduce evidence that Defendants (1) "deliberately interfere[d] with the

10   confidential relationship" between him and Campbell; and (2) that the

11   interference "substantially prejudice[d]" him.  *Williams v. Woodford*, 384 F.3d

12   567, 584-85 (9th Cir. 2002).

13         The Sixth Amendment's application to only "criminal prosecutions,"

14   U.S. Const. amend. VI, is of particular significance here.  Interpreting that

15   phrase, the Supreme Court has held that inmates do not have a right to "either

16   retained or appointed counsel" in "'(p)rison disciplinary hearings (which) are

17   not part of a criminal prosecution.'"  *Baxter v. Palmigiano,* 425 U.S. 308, 315

18   (1976) (alterations in original) (quoting *Wolff*, 418 U.S. at 556, 570).  The clear

19   implication of *Baxter*'s holding is that disciplinary proceedings against criminal

20   defendants do not necessarily qualify as part of "criminal prosecutions" within

21   the meaning of the Sixth Amendment.  "[F]or example, the prison disciplinary

22   hearings that deprive inmates of good time are not considered 'criminal'" for

23   purposes of the Sixth Amendment.  *Sash v. Zenk*, 439 F.3d 61, 63 (2d. Cir.

24   2006).[7]  It follows that an adverse outcome in such a non-criminal jail

25   _____

26         [7] Similarly, in *United States v. Gouveia*, the Supreme Court held that
     inmates did not have a Sixth Amendment right to counsel before indictment on
27   murder charges, even though their conduct had already been the subject of
     prison disciplinary hearings and resulted in their being placed in administrative
28

proceeding does not constitute evidence of "substantial prejudice" that can

support a Sixth Amendment claim.  *Cf. Williams*, 384 F.3d at 585 ("Substantial

prejudice results from the introduction of evidence gained through the

interference against the defendant at trial, from the prosecution's use of

confidential information pertaining to defense plans and strategy, and from

other actions designed to give the prosecution an unfair advantage at trial.").

### a.      Anderson

Jayne alleges that Anderson purposefully sought out phone conversations

between him and Campbell (Dkt. No. 114 at 7), and used these conversations as

the basis for additional criminal charges against him (Dkt. No. 1 at 3; Dkt. No.

114 at 8).  Jayne also stated, however, that Anderson dropped the additional

charges that were allegedly based on his recorded communications to Campbell.

(Dkt. No. 114 at 8, 40.)  Thus, even if Anderson listened to Jayne's calls, even

if he did so deliberately, and even if he brought new charges against Jayne

based on those calls, Jayne has failed to submit evidence that he was

"substantially prejudice[d]," *Williams*, 384 F.3d at 585, in a criminal

prosecution as a result of Anderson's actions.  Accordingly, there is no triable

issue as to whether Anderson violated Jayne's Sixth Amendment right to

counsel.

### b.      Jail Personnel

Jayne also argues that the jail personnel Defendants who listened to his

calls to Campbell violated his Sixth Amendment rights by using the information

in those calls against him in a disciplinary proceeding.  (Dkt. No. 114 at 2, 46.)

Defendants do not contest Jayne's allegation that disciplinary actions were

instituted against him at least in part as a result of his admission, in the

voicemail to Campbell, that he had called Shawna.  (Dkt. No. 97-10; Dkt. No.

segregation.  467 U.S. 180, 187 (1984).

1  97-13 at 2; Dkt. No. 97-16 at 2; Dkt. No. 117 at 177.)  Nonetheless, Jayne

2  cannot prevail on his claim that Defendants' use of the voicemail in this manner

3  violated his right to counsel.

4         As discussed, "substantial prejudice" within the meaning of the Sixth

5  Amendment does not encompass prejudice arising in the context of non-

6  criminal jail disciplinary proceedings.  Although Penland sanctioned Jayne with

7  "30 days lock down [and] loss of all privileges" at the end of the contested

8  hearing (Dkt. No. 97-13 at 5), these consequences do not constitute *criminal*

9  punishment.  Jayne has not produced any evidence that the information gathered

10 in relation to his disciplinary hearing was then forwarded to Anderson for the

11 purposes of criminal prosecution.  On the contrary, Penland has declared that he

12 "did not forward [his] knowledge of the recorded message to the District

13 Attorney's Office for the purpose of any criminal charge against Mr. Jayne."

14 (Dkt. No. 97-13 at 2.)  Heyde, Penland's supervisor, also submitted a

15 declaration stating that he "did not forward or transmit [his] knowledge of the

16 contents of the call to any person in any form" nor "forward that information to

17 the District Attorney's Office."  (Dkt. No. 97-10 at 2.)  Joiner likewise

18 submitted a declaration to that effect.  (Dkt. No. 97-16 at 2).  Because Jayne has

19 not produced any evidence that he was prejudiced in a *criminal* proceeding by

20 the jail personnel's actions, summary judgment is granted on this claim.

21 **3.    Federal Wiretap Act**

22        Finally, Jayne argues that the recording of his phone calls violated the

23 Federal Wiretap Act ("FWA"), 18 U.S.C. §§ 2510-20.  The FWA prohibits the

24 intentional use of "any electronic, mechanical, or other device to intercept any

25 oral communication." *Id.* § 2511(b).  It also proscribes the intentional disclosure

26 or the intentional use of the contents of any prohibited interception.

27 *Id.* § 2511(c)-(d).  Here, Jayne's calls to his attorney were recorded by the jail's

28 default system (Dkt. No. 115-2 at 27-29), and eleven of those calls were played

1   back (Dkt. No. 115-2 at 28).  The recording of the calls on the jail's default

2   system is the original interception, whereas the playing and downloading of the

3   calls are "disclosures" or "uses."  *See Noel v. Hall*, 568 F.3d 743, 749 (9th Cir.

4   2009).  Liability for disclosure or use is contingent on the original interception

5   being unlawful.  *See id.* at 751; 18 U.S.C. § 2511(c)-(d).

6        The FWA prohibits only *intentional* interceptions, meaning that,

7   regardless of whether recording calls to attorneys on the default system is or is

8   not within the "ordinary course of duties" such that they fit within the FWA's

9   law enforcement exception, *see* 18 U.S.C. § 2510(5)(a), if Defendants

10  unintentionally recorded the calls, they did not violate the law.  *See id.*

11  § 2511(1)(a); *see also In re Pharmatrak, Inc.*, 329 F.3d 9, 23 (1st Cir. 2003).

12  Although the Ninth Circuit has not addressed the intent requirement, the First

13  Circuit's analysis is instructive.

14       In *Pharmatrak*, the First Circuit looked to the legislative history of

15  Congress's 1986 amendment to the Act changing the state of mind requirement

16  from "willful" to "intentional."  329 F.3d at 23.  Noting that the legislative

17  history indicated that as used in the amendment "the term 'intentional' is

18  narrower than the dictionary definition" of the term, *see* S. Rep. 99-541, 26

19  (1986), the court concluded "the purpose of the amendment was to underscore

20  that inadvertent interceptions are not a basis for criminal or civil liability" under

21  the Act, 329 F.3d at 23.  Thus, under the Act, "[a]n act is not intentional if it is

22  the product of inadvertence or mistake."  *Id.*

23       Here, Defendants have produced evidence that the initial recording of

24  Jayne's calls to his attorney on the default recording system was inadvertent.

25  Beverly Strand, who was responsible for seeing that attorneys' phone numbers

26  were removed from the default recording system, stated in her declaration that

27  because she was new to the position, she was unaware that she had to request

28  *both* that the attorneys calls be free and that they be unrecorded.  (Dkt. No. 97-

14 at 2.)  She requested GTL not to charge calls to Jayne's attorney's number but did not ask GTL not to record calls to that number.  (Dkt. No. 97-14 at 2.)  As a result, Jayne's calls continued to be recorded.  (Dkt. No. 97-14 at 2.)

Jayne replies that Strand had worked for the Sheriff's Department for many years and therefore knew the jail's policies and procedures.  (Dkt. No. 114 at 39.)  He supports that contention with her testimony in a state court proceeding that she did, in fact, work for the department for over twenty-two years.  (Dkt. No. 117 at 82.)  But, as Strand explained during that same hearing, she had only worked for the *jail* for three months at the time she requested Jayne's calls to his attorney not be charged, and in the position she held for the previous thirteen years, she did not handle such requests.  (Dkt. No. 117 at 84, 87.)  During those thirteen years, Strand asserted, she worked as a secretary for the Sheriff, not in the jail, and therefore was unfamiliar with the jail's policies.  (Dkt. No. 117 at 84.)  Other than pointing to Strand's long-term employment with the Sheriff's Department, Jayne makes only a conclusory statement regarding "intentional illegal misconduct" on the part of the system's administrator.  (Dkt. No. 115-1 at 25.)  He does not, however, point to facts to support that conclusion.  *See Cafasso, ex rel. United States v. Gen. Dynamics*, 637 F.3d 1047, 1061 (9th Cir. 2011) ("To survive summary judgment, a plaintiff must set forth non-speculative evidence of specific facts, not sweeping conclusory allegations.").

Because Jayne has not produced any evidence creating a genuine dispute regarding a material fact as to whether Defendants unlawfully intercepted his calls to his attorney, Defendants' motion for summary judgment on this claim is granted.

## V.  Conclusion

For the foregoing reasons, summary judgment on the disciplinary diet issue is denied as to Ashmun but granted as to Bosenko and Van Buskirk.

1  Summary judgment on the Fourth Amendment attorney-client calls issue is

2  denied as to Defendants Joiner,  Heyde, and Penland but granted as to

3  Defendants Ashmun, Gonzalez, Champagne, Bosenko, Van Buskirk, Meek,

4  Mitchell, and Anderson.  Summary judgment on Jayne's Sixth Amendment and

5  Federal Wiretap Act claims is granted as to all Defendants.

6         This Order resolves Docket Nos. 90, 97, and 121.

7

8  DATED this 19th day of June, 2014.

9

10                              /s/ Marsha S. Berzon
                                MARSHA S. BERZON
11                              United States Circuit Judge, sitting by designation

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28